# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JONATHAN M. MONK,                )
                                 )
        Plaintiff,               )
                                 ) Civil Action No.
v.                               ) 04-1358-SLR
                                 )
WARDEN RAFAEL WILLIAMS & PAM     )
MINOR,                           )
                                 )
        Defendants.              )

Deposition of Jonathan M. Monk taken pursuant to notice at the Department of Justice, 820 North French Street, Wilmington, Delaware, beginning at 1:17 p.m. on Wednesday, November 22, 2006, before Christina M. Vitale, Certified Shorthand Reporter and Notary Public.
APPEARANCES:

  JONATHAN M. MONK
    Pro Se

  EILEEN KELLY, ESQ.
  DELAWARE DEPARTMENT OF JUSTICE
    820 North French Street
    Wilmington, Delaware  19801
    For the Defendants

WILCOX & FETZER
1330 King Street  -  Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com




WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

2

```
 1              JONATHAN M. MONK, the deponent herein,
 2   having first been duly sworn on oath, was examined and
 3   testified as follows:
 4   BY MS. KELLY:
 5     Q.   Mr. Monk, my name is Eileen Kelly.  I work for
 6   the Delaware Department of Justice.  In a lawsuit that
 7   you have filed I represent Rafael Williams and Pam
 8   Minor and you are here today to have your deposition
 9   taken in the lawsuit that you filed again those two
10   individuals.  I want to give you some basic
11   information about how a deposition works.
12            First of all, we have to speak just one at
13   a time because the court reporter can only take down
14   one person speaking at a time.  So, if you wait until
15   I'm done asking my question and I'll wait until you
16   are done giving your answer and that way the record
17   will be clear.  The other issue is that you need to
18   answer audibly.  She can't take down a nod or shake of
19   the head so you need to speak out your answer,
20   whatever it might be.
21            If you don't understand what I'm asking you
22   at any time, just let me know and I'll try to rephrase
23   it.  If you go ahead and answer, I'll assume you
24   understood.
```

```
 1    A.    Okay.
 2    Q.    Have you understand what I have just gone over
 3  with you?
 4    A.    Yes.
 5    Q.    Have you ever had your deposition taken before?
 6    A.    No.
 7    Q.    Have you ever testified in court before?
 8    A.    No.
 9    Q.    And have you ever been a party in a civil
10  lawsuit prior to this case?
11    A.    No.
12    Q.    Have you ever been known by any other names?
13    A.    No.
14    Q.    And what is your date of birth?
15    A.    1/5/67.
16    Q.    Where were you born?
17    A.    Wilmington, Delaware.
18    Q.    Where do you live now?
19    A.    Seven Coachlight Court, one word, L-I-G-H-T,
20  New Castle, Delaware.
21    Q.    How long have you been living there?
22    A.    Twenty-four years.
23    Q.    And are you married?
24    A.    No.
```



Jonathan M. Monk

4

| | | |
|---|---|---|
| 1 | Q. | Do you have any children? |
| 2 | A. | Yes. |
| 3 | Q. | And how old are they? |
| 4 | A. | Twenty-one and nine. |
| 5 | Q. | And what is your highest level of education? |
| 6 | A. | Twelfth. |
| 7 | Q. | Where did you go to school? |
| 8 | A. | William Penn. |
| 9 | Q. | When did you graduate? |
| 10 | A. | 1986. |
| 11 | Q. | Are you currently employed? |
| 12 | A. | Yes. |
| 13 | Q. | Where are you working? |
| 14 | A. | I work through Labor Local 199. |
| 15 | Q. | What is that? |
| 16 | A. | That's a union for laborers. |
| 17 | Q. | Are you working a full work week? |
| 18 | A. | Yes. I mean, according to the weather. |
| 19 | Q. | It's outside work? |
| 20 | A. | Yes. Actually, I'm working through a company |
| 21 | called Rizzo & Son. | |
| 22 | Q. | What kind of company is that? |
| 23 | A. | That's a masonry company. We're building the |
| 24 | administrative building off of Terminal Avenue for the | |

Jonathan M. Monk

5

1  Wilmington Police.
2   Q.  And what is your rate of pay?
3   A.  $20.69 an hour.
4   Q.  How long have you been doing this job?
5   A.  I've been doing this job for a month.
6   Q.  Were you working before that?
7   A.  Yes, but, see, it's construction jobs so they
8  be off and on. Like I might only get -- a job might
9  only last two months, three months, you know, depends
10 what point in time I got placed on the job.
11  Q.  How long have you been working through Labor
12 Local 199?
13  A.  Ten years.
14  Q.  You said you are making about $20.00 an hour
15 now?
16  A.  Yes.
17  Q.  Is that what you have been making for the past
18 year?
19  A.  Yes, yeah, that's the rate that has been for
20 the past year. When I joined in '96 it was only 15.
21  Q.  You make the same amount on every job, is that
22 right?
23  A.  Yes.
24  Q.  Do you have any pending criminal matters?

Jonathan M. Monk

6

1    A.    No, ma'am.

2    Q.    I need to go over with you briefly your

3 criminal record, criminal history.

4    A.    Okay.

5    Q.    About when was the first time you were

6 incarcerated?

7    A.    1991.

8    Q.    Do you remember what that was for?

9    A.    Um-hum.

10    Q.    What was it?

11    A.    Possession of cocaine.

12    Q.    And you were incarcerated for that?

13    A.    Yes.

14    Q.    About how long?

15    A.    Five years.

16    Q.    And where were you?

17    A.    I was in New York.

18    Q.    That was in New York, not here?

19    A.    Yeah, that was federal.

20    Q.    And when was the next time you were

21 incarcerated after that?

22    A.    About 2000 -- let me see, hold on, about 2001.

23    Q.    And where was that?

24    A.    It was here.


WILCOX & FETZER LTD.
Registered Professional Reporters

```
 1    Q.   And what was the charge?
 2    A.   I think that was another possession charge,
 3  yeah, possession of heroin.
 4    Q.   How long were you incarcerated for that?
 5    A.   One year.
 6    Q.   Where were you?
 7    A.   Gander Hill, one year.
 8    Q.   And were you incarcerated at any time after
 9  2001?
10    A.   Yes.
11    Q.   What was that?
12    A.   That was for a violation of probation.
13    Q.   How long was that?
14    A.   That was for one year.
15    Q.   When was it?
16    A.   That was when this incident happened, so I
17  believe that was March of 2004.
18    Q.   Is that when you began the sentence?
19    A.   Yes, until, until March 2005.  So, one year.
20    Q.   Were you at Gander Hill?
21    A.   Yes.
22    Q.   Do you remember when your actual release date
23  was?
24    A.   Actually, it was the last day of February,
```



WILCOX & FETZER LTD.
Registered Professional Reporters

Jonathan M. Monk

8

```
 1   28th.
 2      Q.   Of 2005?
 3      A.   Yes.
 4      Q.   Have you ever received any substance abuse
 5   treatment?
 6      A.   Yes.
 7      Q.   When was that?
 8      A.   That was -- my sentence was there so I entered
 9   the program in like May, May of 2004, and then I was
10   removed from the program because of the incident
11   August 15th of 2004.  So, I was only in there for
12   about three months.
13      Q.   Was that the Key program?
14      A.   Yes.
15      Q.   Is that the only substance abuse program you
16   have ever participated in?
17      A.   No, no.  I had done the Crest program also.
18      Q.   Where was that?
19      A.   That was on Market Street.  See, that was
20   because of my violation.  So, that was about 2000 --
21   maybe 2002, 2003, one of them.
22      Q.   Was that part of the prison system?
23      A.   Yes.
24      Q.   It was at --
```



WILCOX & FETZER LTD.
Registered Professional Reporters

```
 1    A.    Yeah, that was -- that's why -- where I said
 2  that year before the violation, that was that, you
 3  know, because I done some time at level five, which
 4  was Gander Hill, and then I done remainder on Market
 5  Street in the Crest, but it all equaled out to about a
 6  year.
 7    Q.    Did you finish that program?
 8    A.    Yes.
 9    Q.    Any other substance abuse programs?
10    A.    No, ma'am.
11    Q.    At the time that this incident happened you
12  were at Howard Young on a violation of probation
13  charge?
14    A.    Yes.
15    Q.    What is the Key program?
16    A.    It's a drug treatment program that I was court
17  ordered to after I had told my judge that I relapsed
18  and that was the reason that I stopped going to see my
19  probation officer.  So, she sentenced me to a year
20  suspended upon necessary completion of the program.
21    Q.    Was that your violation, not reporting to your
22  probation officer?
23    A.    Yes.
24    Q.    Once you completed the drug program you would
```



```
 1  have been released?
 2     A.   Yes, I would have, but they didn't let me go
 3  back in the program.
 4     Q.   Is the Key program at Howard Young?
 5     A.   Yes.
 6     Q.   Is it a separate housing unit?
 7     A.   Yes.  It's like a dormitory, like a big
 8  warehouse-type area.
 9     Q.   How long is the Key program supposed to last?
10     A.   For my sentence it was six months because I had
11  short-term.  I had a short-term treatment because I
12  only had a year sentence.  A person that may have a
13  five-year sentence or more they probably have to do
14  about 18 months.
15     Q.   You were supposed to do six months at Key?
16     A.   Yes.
17     Q.   Why don't you just tell me a little bit about
18  the incident you have mentioned in your complaint
19  where I guess you were removed from the treatment
20  program.  Just tell me little bit about what happened.
21     A.   This was August 15th, 2004 on a Sunday.  Prayer
22  time was at eight o'clock.  So, each time before
23  prayer you have to make wudu or absolution as we call
24  it where you cleanse yourself up.  So, being as though
```

1  everybody was aware their count came in at eight
2  o'clock everybody prepared theirself for prayer.  When
3  the count came in, we wouldn't be interfering with the
4  count by walking around so we were prepared about
5  quarter to eight.
6         For some reason this particular day the
7  officer, lady's name, Johnson -- I don't know her
8  first name, she only works there on Sundays -- for
9  some reason she called a code three, which is inciting
10 a riot.  The three months prior to this incident has
11 never been a problem.  I was getting off our bunks and
12 offering prayer besides our bunks because we wouldn't
13 be moving around or we're not in congregational, you
14 know, we're separated beside our bunks.
15        Like I said, for some reason she called a
16 code three, which is inciting a riot, and they came
17 down there and physically removed us, sent us to
18 different pods or what you might call different cells
19 on the west side of the building.
20  Q.  This was eight o'clock in the evening?
21  A.  Yes, this was eight o'clock.
22  Q.  This was in the Key program housing unit?
23  A.  Yes, ma'am.
24  Q.  When you had to get washed up, is that what you



1   are saying?

2   A.  Um-hum.

3   Q.  Was there like a bathroom in the pod that you

4   would go to?

5   A.  Yes.

6   Q.  So, you are not in cells, you are like in bunk

7   beds in a big room?

8   A.  Exactly, it's wide open.

9   Q.  How many people are in that housing unit?

10  A.  I'll say about a good hundred, about a good

11  hundred, and the thing was the lady -- because I had

12  asked her some months later after the situation was

13  over I asked her why did that happen and she said that

14  it was from higher above her and that she had told

15  everybody to get on their bunks, but if -- it's 100

16  beds in there.  If she is way over about 30 feet or 50

17  feet away, there was no way to be heard.  It's not

18  like they use intercoms or anything in there.

19          Like I said, it has never been a problem

20  the three months prior to that that we offer our

21  prayer beside our bunks regardless of what time it was

22  or what was going on because we wouldn't be in

23  anybody's way.

24  Q.  This is something you would do at eight o'clock



1  every evening?
2  A. Yes. The time varies. It might be 7:55, you
3  know. Then, as the days go on, you know, you lose
4  minutes. At that time it did come in around eight
5  o'clock, maybe 7:59, something like that.
6  Q. Is this tied into sunset? I'm trying to figure
7  out why would the time change from day-to-day.
8  A. Yes, sunset.
9  Q. Depending when the sunset was you would have it
10 at a different time, is that right?
11 A. It just progresses as the year goes on. Like
12 the morning count might be at five o'clock, say, in
13 about January and then by the time May gets here it
14 doesn't come in until about 5:30. It's according to
15 the --
16 Q. According to what?
17 A. What do you call that? Hemisphere. I don't
18 know the word for it.
19 Q. There is a specific time you are supposed to be
20 doing this?
21 A. Yeah, in the Koran it says that salat is best
22 offered at its proper time, its earliest time. If you
23 are up and able to do it, it's best to do it as early
24 as possible. I mean, there is like time periods where



Jonathan M. Monk

14

1  you can do it in between, but it's better received if
2  you offer it at its earliest given time.
3      Q.   How many times a day would you do this?
4      A.   Five times.
5      Q.   Now, you were not on the only person on that
6  housing unit who was --
7      A.   Removed.
8      Q.   But you weren't the only person who was praying
9  at that moment?
10     A.   No, ma'am.
11     Q.   Do you remember how many people there were?
12     A.   Roughly, probably about a good 15, maybe 20.  I
13 believe it was like 11 of us that they removed.
14     Q.   And you were all doing prayer at the same time?
15     A.   Yes, but nobody was together.  Everybody was
16 beside their bunk.  Like you might be -- he might be
17 on bunk 40, I might be on bunk 60, he might be on 22.
18 You know, it was like that.
19     Q.   So, you were right next to your bunk?
20     A.   Yes.
21     Q.   Are you saying in the past there had been no
22 problem with you praying next to your bunk during
23 count?
24     A.   Never, never a problem.  The thing was we were

1 really respectable. Like they might put a memorandum
2 up saying, okay, you can't make congregational salat
3 unless you are in a chapel. Congregational salat is
4 two or more. That was respected, okay, if that's what
5 can't be done, that's what we can't do. Same thing
6 with that, had they put a memorandum up saying salat,
7 you can't make prayer during this time or that it
8 would have been respected, but there was never nothing
9 in print saying that that couldn't be done.
10         Like I said, I was there for three months
11 and it has never been a problem. Not just during that
12 Sunday where Officer Johnson worked, but any of the
13 other days during the week it has never been a
14 problem.
15   Q.   You had had prior situations where you had been
16 praying during count?
17   A.   Yes.
18   Q.   Would you say it was many prior times?
19   A.   Three months.
20   Q.   Three months of praying around or about eight
21 o'clock on count?
22   A.   Yes.
23   Q.   And this particular Officer Johnson did you
24 say?

